STUDENT LOAN MARKETING
ASSOCIATION, Plaintiff,

v.

Richard RILEY, Secretary of the
United States Department of
Education, Defendant.

Civ. No. 95–717.

United States District Court,
District of Columbia.

Nov. 16, 1995.

Alan Jay Kriegel, Robert Stephen Bennett, Richard Louis Brusca, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, for plaintiff.

Sheila Mae Lieber, Margaret Hopkins Plank, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter comes before the Court on cross-motions for summary judgment. Plaintiff, Student Loan Marketing Association ("Sallie Mae"), challenges a provision of the Omnibus Budget Reconciliation Act of 1993 (the "Budget Act") which imposes an annual fee on student loans which Sallie Mae acquires in the secondary market.[1] The annual fee is equal to 0.30 percent (30 basis points) of the principal amount of each loan Sallie Mae "holds." Plaintiff seeks a declaratory judgment that the statutory provision is unconstitutional on its face as an uncompensated taking of private property and a denial of equal protection in violation of the Fifth Amendment. Plaintiff also asks this Court to declare that the Secretary of Education has acted arbitrarily and capriciously in interpreting the provision to require payment of the fee on loans which Sallie Mae transfers to a separate trust as part of a privatization transaction.

Defendant moves the Court to dismiss the claim for lack of jurisdiction and failure to state a claim. In the alternative, Defendant seeks summary judgment declaring that the statutory provision imposing fees on loans which Sallie Mae "holds" is constitutional, and affirming the decision of the Secretary.

### FACTUAL BACKGROUND

This case has its roots in the Higher Education Act of 1965 ("HEA") which, as amended, created the Guaranteed Student Loan Program[2] to increase the availability of financial assistance to students seeking a college education. In 1992, Congress changed the name of the program to the Federal

---

1. Pub.L. No. 103–66, Aug. 10, 1993, 107 Stat. 356, 367 (codified at 20 U.S.C. § 1087–2(h)(7)(A)).

2. 20 U.S.C. § 1070 et seq.

Family Education Loan ("FFEL") Program. Pub.L. No. 102–325, Title IV, § 411(a)(1), 106 Stat. 510.

Under the FFEL Program, financial institutions make low-interest loans to students or their families, which are guaranteed by state or non-profit guaranty agencies that are reinsured by the United States, through the Department of Education ("DOE"). Section 431 of the HEA creates a student loan insurance fund for making payments in connection with the default of loans insured by the Secretary of Education under the Program. 20 U.S.C. § 1081.

In 1972, Congress created Sallie Mae to enhance financial support for federally-guaranteed student loans. 20 U.S.C. § 1087–2. Sallie Mae's charter restricts the authorized activities in which it may engage. 20 U.S.C. § 1087–2(d). It further defines the types of obligations Plaintiff may incur,[3] and subjects the entire enterprise to general oversight by the Department of Education and general financial oversight by the Department of Treasury. *See* 20 U.S.C. § 1087–2(r).

Sallie Mae is controlled by a Board of Directors of 21 members. Seven members are appointed by the President of the United States, with 14 members being elected by Sallie Mae shareholders.[4] The President appoints the Chairman of the Corporation from among the 21 board members. 21 U.S.C. § 1087–2(c)(1).

Sallie Mae's status as a government-sponsored enterprise ("GSE") has given it a number of advantages that affect its costs and profitability: (1) Sallie Mae received start-up financing through the Federal Financing Bank with a Department of Education guarantee; this allowed Sallie Mae to borrow at a lower interest rate than otherwise would have been available; (2) Sallie Mae's capital/debt ratio requirements are significantly lower than those of commercial banks and other financial institutions participating in the FFEL Program;[5] this increased Sallie Mae's liquidity; (3) the extensive links between Sallie Mae and the federal government have created a market perception that the government would use federal funds to prevent a default of Sallie Mae debt; (4) Sallie Mae's debt offerings are exempt from SEC registration requirements, and its federal charter exempts it from state and local taxes.[6]

As part of a privatization initiative, Sallie Mae has begun implementing an asset-backed securitization program. At oral argument, Plaintiff's counsel indicated that the program contemplates the securitization of approximately $2 billion in loans out of a portfolio of approximately $32 billion. The type of transaction proposed has been described as follows:

> "[Securitization] is a technique whereby income-producing assets, in most cases, illiquid, are pooled and converted into capital market instruments. In a typical financing, a sponsor transfers a pool of assets to a limited purpose entity, which in turn issues non-redeemable debt obligations or equity securities with debt-like characteristics.... Payment on the securities depends primarily on the cash flows generated by the pooled assets." SEC Exclusion From the Definition of Investment Company Act for Structured Financings, 17 C.F.R. § 270 (1992).

Under the terms of the proposed transaction, Sallie Mae will sell student loans to a wholly-owned subsidiary. The subsidiary will in turn establish a trust, organized for the dual purposes of financing the purchase of and holding the loans. The trust will finance 95 percent of the purchase price with the sale of debt securities to institutional

---

3. *See* 20 U.S.C. § 1087–2(h).

4. 20 U.S.C. § 1087–2(c)(1)(A). Of the fourteen board members elected by Sallie Mae shareholders, seven are to be affiliated with educational institutions, and seven are to be affiliated with financial institutions. *Id.*

5. Sallie Mae is required to satisfy a capital requirement of two percent of assets. 20 U.S.C. § 1087–2(r)(4). This requirement is significantly less than the eight percent capital requirement that banks regulated by a Federal or State government agency must maintain and the capital amount (usually in excess of 8 percent) other financial institutions that participate in the FFEL Program must maintain to satisfy bond rating agencies. (Oxendine Decl. ¶ 5(c).)

6. 20 U.S.C. § 1087–2(b)(2).

investors. The remaining five percent of the capitalization will be in the form of equity certificates; four percent will be sold to institutional investors and one percent will be held by Sallie Mae as partial consideration for the transfer of the loans.

Sallie Mae would receive compensation for the sale of the loans in several forms: 1) the one percent equity interest referenced above; 2) a cash payment approximately equal to the principal and accrued interest on the loans sold; 3) deferred purchase price payments equal to the cash flows of the trusts after certain costs; and 4) a residual interest in the trust upon its termination. In addition, Sallie Mae or one of its subsidiaries would continue to service the portfolio and receive a payment for that service.

On August 10, 1993, as part of its Omnibus Budget Reconciliation Act of 1993,[7] Congress enacted § 439(h)(7), the provision at issue in this case. This provision requires Sallie Mae to pay the Secretary of Education an offset fee on a monthly basis. The fee is calculated on an annual basis in an amount equal to 0.30 percent of the principal amount of each loan made, insured or guaranteed under the FFEL Program that Sallie Mae holds and that are acquired on or after August 10, 1993. 20 U.S.C. § 1087–2(h)(7)(A). No comparable fee is imposed on any other participant in the secondary market for student loans or the FFEL Program. The provision further requires that the Secretary of Education deposit the fees paid by Sallie Mae in the student loan insurance fund established under the HEA. 20 U.S.C. § 1081.

Following enactment of § 439(h)(7), representatives of Sallie Mae and the DOE had several discussions and exchanged letters regarding the applicability of the offset fee to funds transferred to a trust for purposes of securitization. Of particular importance to this action are two letters from DOE to Sallie Mae. The first letter, dated January 13, 1995, was written by DOE's Acting General Counsel and advised Sallie Mae that the agency took the position that student loans transferred to a business trust for purposes of securitization would be subject to the offset fee. In a second letter, dated March 16,

1995, DOE's Deputy General Counsel informed Sallie Mae of the agency's continued adherence to the view that Sallie Mae would be deemed to "hold" loans transferred to a trust for securitization for purposes of the offset fee provision.

On April 9, 1995, representatives of Sallie Mae's Board of Directors met with Defendant Richard Riley, Secretary of Education. At this meeting, the Secretary said he would not reverse the Department's stated position. Sallie Mae indicated that it was prepared to litigate the matter. Shortly thereafter, Sallie Mae filed this action.

### SUMMARY JUDGMENT STANDARDS

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." If a "motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R.Civ.P. 56(e).

In the first instance, the moving party must provide sufficient factual support that it is entitled to judgment as a matter of law by "identifying ... portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion." *Id.*

### MOTION TO DISMISS STANDARDS

In ruling on a motion to dismiss for failure to state a claim upon which relief may be

---

**7.** Pub.L. 103–66, Title IV, Subtitle B.

granted, the Court must accept as true each of the allegations in the complaint. The motion should not be granted unless it appears that the plaintiff can prove no set of facts entitling him or her to the relief sought in the complaint. *See, e.g., Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

## ANALYSIS

## I. PLAINTIFF'S FACIAL CHALLENGE TO THE 30 BASIS POINT FEE

### A. THE "TAKINGS" CLAIM

#### *Jurisdiction*

█ The threshold question is whether this Court has subject matter jurisdiction over Plaintiff's "takings claim." Defendant hinges its jurisdictional argument on the claim that the availability of compensation under the Tucker Act precludes the award of declaratory relief. Specifically, Defendant maintains that a request for declaratory relief for an unconstitutional taking of private property is inappropriate where the government has provided an adequate process for obtaining compensation.[8] Defendant claims that the government has provided an adequate process for obtaining compensation in this case: an action for damages under the Tucker Act, 28 U.S.C. § 1491(a)(1). Finally, Defendant argues that—since declaratory relief is inappropriate and the damages sought here exceed $10,000—this Court should decline jurisdiction in favor of the Court of Federal Claims. Defendant notes that the law of the D.C.Circuit is currently in flux over whether United States District Courts have jurisdiction over takings claims for compensation in excess of $10,000.[9]

The Defendant goes too far in suggesting that declaratory relief is never appropriate where the Plaintiff could seek compensation for an otherwise proper taking. It is true that declaratory judgment actions may not be appropriate in cases involving threatened seizures of real or other tangible property. *See Preseault v. ICC,* 494 U.S. 1, 110 S.Ct. 914, 108 L.Ed.2d 1 (1990) (precluding declaratory judgment actions if the property owner has not yet brought an action in the Court of Federal Claims for just compensation where the taking involved reversionary interests in land). However, where the threatened injury is a statutorily-mandated seizure of money, there is authority which makes clear that declaratory relief is available. *See, e.g., Concrete Pipe & Prods. v. Construction Laborers Pension Trust,* 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993); *Connolly v. Pension Benefit Guar. Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1532–33 (D.C.Cir.1984) (en banc), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985).

The distinction between real or intangible property on the one hand and money on the other hand is based on the idea that Congress would not have intended to create a situation where every dollar paid pursuant to a statute would generate one dollar of Tucker Act compensation. *See In re Chateaugay Corp.,* 53 F.3d 478 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 298, 133 L.Ed.2d 204 (1995). To require continuous refund actions would be inefficient where, as here, statutory payments must be made on a monthly basis and actions to recoup those payments would have to be filed every time payments are made.

Because the takings claim at issue here involves the continuous seizure of money, declaratory relief is available, and the Court

---

**8.** Defendant cites several Supreme Court opinions in support of its argument. See, e.g., *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 315, 107 S.Ct. 2378, 2385–86, 96 L.Ed.2d 250 (1987) (stating that the Fifth Amendment is designed "not to limit the governmental interference with property rights *per se,* but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking"); *Williamson County Regional Planning Comm'n,* 473 U.S. 172, 105 S.Ct.

3108, 87 L.Ed.2d 126 (1985); *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

**9.** *Compare Transcapital Fin. Corp. v. Director, Office of Thrift Supervision,* 44 F.3d 1023, 1025 (D.C.Cir.1995) (noting that district courts do not have such jurisdiction) *with A & S Council Oil Co., Inc. v. Lader,* 56 F.3d 234, 238 (D.C.Cir. 1995) (declining to reach the issue).

has jurisdiction to consider the constitutionality of the statute in question.

### Plaintiff's Substantive Takings Claim

■ There is no "set formula" for determining whether a deprivation of property constitutes a "taking." *Connolly v. Pension Benefit Guar. Corp,* 475 U.S. 211, 224, 106 S.Ct. 1018, 1025, 89 L.Ed.2d 166 (1986). The Supreme Court has identified three factors to aid in consideration of a takings claim: (1) the character of the governmental action; (2) the action's economic impact; and (3) the action's interference with reasonable "investment-backed expectations." *Id.* at 225, 106 S.Ct. at 1026 (quoting *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)).

■ In determining the character of the governmental action, the Supreme Court has stressed that an action is more likely to be a taking "when the interference with the property can be characterized as a physical invasion by the government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 426, 102 S.Ct. 3164, 3171, 73 L.Ed.2d 868 (1982) (citations omitted).

■ In *Connolly,* the Supreme Court rejected a takings challenge to legislation that required private employers who chose to withdraw from multiemployer pension plans to pay a proportionate share of the relevant plan's unfunded but vested benefits in order to prevent the failure of the plans. *Connolly,* 475 U.S. at 215, 106 S.Ct. at 1021. This statutorily-imposed fee created a liability in excess of the limited liability expressly fixed by the pension plan agreements. *Id.* at 223, 106 S.Ct. at 1025. The Court held that the fee required of withdrawing employers adjusted private economic rights for the common good rather than appropriating fees for the government's own use, and therefore was

not a wrongful "taking." *Id.* at 225, 106 S.Ct. at 1026.

Like the fee imposed in *Connolly,* the fee at issue here is an adjustment of private economic rights for the public good. The fees assessed against Sallie Mae contribute to an insurance fund which provides protection to owners of defaulted loans insured under the guaranteed loan program. Previously, payment of defaulted loans came directly from the U.S. Treasury. For more than 20 years, Sallie Mae has benefited from the federal guarantee of student loans. All that Congress has done with the HEA is to impose on Sallie Mae some of the burden for the benefit it has received for so long. As in *Connolly,* the fact that the burden was not imposed simultaneously with the benefit is not relevant.

Despite the clear link between the fee imposed and the benefits received, Sallie Mae characterizes the measure as a taking of private property done solely to reduce the federal deficit.[10] In support of its claim, Sallie Mae points to the physical location of the fee provision within the Budget Act, the recitation within the legislative history of the statute's purpose of "ensur[ing] compliance with ... deficit reduction goals,"[11] and the absence of any specific declaration that the fee is intended to adjust benefits and burdens of economic life. Where the provision is placed in Congress's overall legislative program is immaterial. If the statute is lawful, it must be sustained. Under the act, the fee shifts some of the burden of insuring student loans from the general Treasury, and ultimately the American taxpayer, to the government entity which most directly benefits from the insurance fund. As such, the fee adjusts burdens and benefits for the common good and is proper governmental action.

The action's economic impact does not support Plaintiff's claim that the fee is a taking in violation of the Fifth Amendment. There is no evidence that the costs imposed by the fee outweigh the benefits Sallie Mae has

---

10. Sallie Mae argues that the Budget Act imposes a burden without granting any reciprocal benefit. This argument ignores the fact that the fee provision, although passed as part of the Budget Act, is an amendment to the HEA. As such, it would be inappropriate for this Court to view the

burden of the fee in isolation from the benefits conferred by the HEA.

11. H.R.Cong.Res. 64, 103d Cong., 1st Sess. § 12(a) (1993); 139 Cong.Rec. H1747, H1753 (daily ed. Mar. 31, 1993).

received and continues to receive from the government. As noted above, Sallie Mae receives substantial benefits from its status as a GSE, including: (1) exemption from state and local taxes,[12] (2) reduced interests rates, and (3) relaxed capital requirements.

Sallie Mae argues that, because its operations have always been conducted at no cost to the taxpayers, there is no obligation to the taxpayers to which the fee might be said to be proportional. The facts do not sustain Sallie Mae's claim that its operations do not rely in any way on taxpayer support. The provision of seed money at reduced interest rates, the insurance of loans held by Sallie Mae by U.S. Treasury funds, and Sallie Mae's tax-exempt status with respect to state and local taxes are all benefits conferred on Sallie Mae by the taxpayers.

Plaintiff's claim that the fee is a taking because it interferes with reasonable "investment-backed expectations" also fails. As the Supreme Court emphasized in *Connolly*, " '[t]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent Amendments to achieve the legislative end.' " *Connolly*, 475 U.S. at 227, 106 S.Ct. at 1027 (*quoting FHA v. Darlington, Inc.*, 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958)). Applying this principle, the *Connolly* Court concluded that, despite the specific provisions limiting liability, employers were on notice that new obligations might be imposed by Congress. Here, too, Sallie Mae is a federally-chartered corporation, whose business is constrained by the legislation that brought it into existence. *See* 20 U.S.C. § 1087–2. As we in this nation are now experiencing, few if any congressionally-enacted programs are immune from curtailment or indeed outright abolishment. Since Sallie Mae is a federally created and regulated program, investors are on notice that new statutory obligations could be imposed at the will of Congress. As such, the imposition of the offset fee does not impermissibly interfere with investors' reasonable expectations.

In sum, after applying the three factors identified by the Supreme Court as relevant in making a takings determination, this Court finds that the imposition of the offset fee on loans held by Sallie Mae is not an uncompensated taking of Sallie Mae's property, and does not violate the Fifth Amendment.

## B. THE EQUAL PROTECTION CLAIM

■ The final basis of Plaintiff's facial attack on the constitutionality of the fee provision is an equal protection claim, based on the Fifth Amendment. Specifically, Plaintiff claims that there is no rational basis for imposing the 30 basis point fee on Sallie Mae alone, and not also on other participants in the FFEL program. Sallie Mae, by virtue of its GSE status, is unique among the participants in the secondary market for student loans. Congress' determination that the benefits conferred on Sallie Mae by its GSE status warrant imposition of a fee to be contributed to the insurance fund for loans under the FFEL Program certainly meets the rational basis test. What is more, since Sallie Mae is a creation of the Congress, it can be abolished by Congress in whole or in part.

## II. PLAINTIFF'S CHALLENGE TO THE 30 BASIS POINT FEE "AS APPLIED" TO SECURITIZED LOANS

Sallie Mae also challenges § 439(h)(7) as applied to the loans which Sallie Mae seeks to transfer to an independent trust. For the same reasons which the Court found the fee provision was facially valid, the Court also finds that the provision is not unconstitutional as applied to the securitized loans.

## III. PLAINTIFF'S CHALLENGE TO THE DEPARTMENT OF EDUCATION'S INTERPRETATION OF THE BUDGET ACT TO REQUIRE PAYMENT OF THE 30 BASIS POINT FEE ON SECURITIZED LOANS

### A. RIPENESS

■ DOE argues that Plaintiff's challenge to its determination that the offset fee provi-

---

12. Plaintiff responds that most of Sallie Mae's competitors are nonprofit or state-related entities that also operate under exemptions from state and local taxes. This argument misses the point. Unlike its competitors, were it not for the HEA, Sallie Mae—a private, for-profit corporation—would not otherwise satisfy the requirements for tax-exempt status.

sion encompasses transferred loans is neither "final agency action" under § 10 of the Administrative Procedures Act ("APA") nor ripe for review under general constitutional principles. Although the APA requirement of final agency action and the ripeness doctrine present overlapping issues, the question of final agency action is an independent jurisdictional requirement that must be satisfied before a court considers the issue of ripeness generally. *See Public Citizen v. Office of U.S. Trade Representatives*, 970 F.2d 916, 921 (D.C.Cir.1992). Thus, the Court will first address the issue of finality under the APA.

### APA Requirement of "Final Agency Action"

Federal court jurisdiction to review agency action depends on whether such action is merely a preliminary decision or a definitive ruling made by one with authority to bind the agency. Under the APA, federal courts have limited jurisdiction to review "final agency action" for which there is no other adequate judicial remedy. 5 U.S.C. § 704. Conversely, when the agency position is tentative, the interest in postponing review is powerful. *See, e.g., Pub. Citizen Health Research Group v. Comm'r, FDA*, 740 F.2d 21, 31 (D.C.Cir.1984). "Once the agency publicly articulates an unequivocal position, however, and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review." *Ciba–Geigy Corp. v. EPA*, 801 F.2d 430, 434 (D.C.Cir.1986).

In this case, Defendant argues that there is no final action because the letters from the General Counsel's Office represent mere advisory opinions of subordinate officials within the DOE. There is impressive authority for Defendant's legal assertion that opinions of subordinate, legal personnel within an agency are not reviewable "final agency action." [13]

Defendant's factual claim that the letters conveyed the opinion of the General Counsel's Office and not of the agency head belies the plain language of the letters. Indeed, the letters are replete with indications that the opinions conveyed were those of the Secretary of Education.[14] In addition, the Secretary himself orally and unequivocally affirmed the opinion during his April 12, 1995 meeting with members of Sallie Mae's Board. (Arceneaux Aff.) Moreover, the letters contained no limitations nor any suggestion that the opinion was merely preliminary. *See Nat'l Automatic Laundry & Cleaning Council v. Shultz*, 443 F.2d 689, 702 (D.C.Cir.1971) (identifying one indicia of "final action" as the absence of language indicating the opinion is "tentative or otherwise qualified by arrangement for reconsideration").

In sum, while there are many occasions in which a letter from an agency's General Counsel Office will be merely a nonbinding advisory opinion, this is not one of those cases. Here, the letters unequivocally articulate the agency's view, clearly attribute the opinions to the Secretary, and bluntly demand that Sallie Mae comply with the Secre-

---

**13.** *See Am. Fed'n of Gov't Employees v. O'Connor*, 747 F.2d 748 (D.C.Cir.1984), *cert. denied*, 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985) (holding advice of Special Counsel did not bind the Merit Systems Protection Board); *Sabella v. United States*, 863 F.Supp. 1 (D.D.C.1994) (holding a letter from the General Counsel of the National Oceanic and Atmospheric Administration setting forth her interpretation of a statute was not "final agency action").

**14.** For example, the following are excerpts from the first letter from DOE to Sallie Mae:

—*"The Secretary of Education* ... believes that Sallie Mae's position is not supported by the law and expects Sallie Mae to pay the full amount of the fee due and owing under the law."

—"[T]he *Secretary* believes it is appropriate to interpret the term "holds" to include any loan in which Sallie Mae holds a direct or indirect financial interest."
—"[T]he *Department's opinion* on this issue is based on our understanding of the securitization transactions contemplated by Sallie Mae as reflected above."
(Letter from Winnick to Greene of 1/13/95) (emphasis added).
In addition, the second letter—which states "we have concluded that our initial view was correct and that the offset fee would be owed on loans transferred to a business trust"—makes clear that the opinion was no longer merely an initial or preliminary opinion, but was a definitive decision made after careful reflection of the record. (Letter from Baxter to Greene of 3/16/95).

tary's stated position. Thus, the Court finds the letters in issue to be "final agency action" within the meaning of § 10 of the APA, 5 U.S.C. § 704.

### The General Requirement of Ripeness

Defendant also argues that, even if the letters from DOE's General Counsel Office are "final agency action", this Court should decline to exercise jurisdiction on general ripeness principles. The Court disagrees, and finds that the matters before it are ripe for decision.

■ Courts analyzing the ripeness of pre-enforcement agency action must consider "both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). Factors relevant to the inquiry regarding fitness for judicial review include "whether the issue presented is a purely legal one, whether consideration of that issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Ciba–Geigy*, 801 F.2d at 435.

■ With respect to the first two elements of this test, DOE claims that judicial consideration would require determinations of fact and would benefit from a more concrete setting since the situation proposed by Sallie Mae is merely hypothetical. Sallie Mae is scheduled to undertake a pilot securitization program and, through a wholly-owned subsidiary, has filed a shelf registration statement with the Securities and Exchange Commission ("SEC").[15] The prospectus is consistent with the terms which Sallie Mae discussed with DOE, and describes the planned transaction in significant detail. Just as these facts were sufficiently concrete for the DOE to issue an opinion, so are they concrete enough for judicial review.

In evaluating the second element of the ripeness analysis—hardship to the parties of withholding judicial review—courts have considered whether an agency has "purport[ed] to give an authoritative interpretation of a statutory provision that has a direct effect on the day-to-day business" of the party seeking review. *Abbott Laboratories*, 387 U.S. at 152, 87 S.Ct. at 1517. Here, the DOE has made clear that it expects compliance with its ruling. In addition, applying the 30 basis point fee to loans transferred to an independent trust as part of Sallie Mae's securitization program could affect Sallie Mae's day-to-day business operations by jeopardizing the securitization program itself. At the very least, application of the fees would undermine the economic feasibility of the securitization program, which is an important part of Sallie Mae's efforts to privatize.[16]

Defendant seeks to differentiate this case from the facts presented in *Abbott Laboratories* and *Ciba–Geigy*, which required plaintiffs to choose between implementing expensive compliance programs or facing serious civil and criminal penalties.[17] DOE argues that the agency action in this case does not require Plaintiff to go to great expense to conform its conduct to regulatory mandates but instead merely to continue the status quo.

Defendant's attempted distinction is overly technical. It is true that the facts here differ from those in *Abbott Laboratories* and *Ciba–*

---

**15.** Indeed, subsequent to oral argument, Sallie Mae advised the Court that, on October 26, 1995, it completed the securitization of approximately $1 billion of student loans on substantially the same terms as set forth in its preliminary shelf registration statement.

**16.** Sallie Mae believes the securitization program would demonstrate to the financial markets that Sallie Mae is capable of raising capital other than through the issuance of GSE debt obligations. (Overend Decl. ¶¶ 15, 16, 22). In addition, securitization provides Sallie Mae an off-balance sheet funding opportunity. (Overend Decl. ¶ 16).

**17.** In *Ciba–Geigy*, the Environmental Protection Agency's interpretation of a particular statute required the Plaintiff to incur great expense to change the labeling of its registered pesticide or risk serious civil and criminal penalties. *Ciba–Geigy*, 801 F.2d 430. Similarly, in *Abbott Laboratories*, the Plaintiff had to choose between changing all their labels, advertisements and promotional materials for certain prescription drugs or risking serious criminal and civil penalties. *Abbott Laboratories*, 387 U.S. at 153, 87 S.Ct. at 1518.

*Geigy.* Nevertheless, the threatened harm here presents a compelling case for judicial review. Maintaining the status quo would cause Sallie Mae to forego an investment opportunity which has major implications for Sallie Mae's financial health. The securitization initiative would allow Sallie Mae to diversify sources of capital and, indeed, to identify new pools for investment. It would be manifestly unfair to hold Sallie Mae's transaction hostage to the Secretary's determination by precluding judicial review at this stage.

For the foregoing reasons—and in view of guidance from this Circuit that on close questions of ripeness there is a "presumption of reviewability" [18]—the Court holds that the controversy presented herein is ripe for judicial review.

## B. DEFENDANT'S CLAIM THAT THE HEA BARS ISSUANCE OF DECLARATORY RELIEF

■ Defendant argues that the HEA expressly precludes the award of declaratory relief requested in this case. The HEA contains a limited waiver of sovereign immunity, allowing the Secretary to "sue and be sued" in connection with the FFEL Program, but prohibiting any "attachment, injunction, garnishment, or other similar process, mesne or final" to be issued against the Secretary. 20 U.S.C. § 1082(a)(2). Defendant claims that an adverse declaratory ruling in this action would have the effect of an injunction precluding the agency from acting on the opinion set forth in the letters from the General Counsel's Office, and hence is barred by the anti-injunction provision of the HEA.

There is substantial authority holding that anti-injunction clauses do not preclude consideration of requests for declaratory relief. *See, e.g., Thomas v. Bennett,* 856 F.2d 1165, 1167 (8th Cir.1988) (the district court could properly consider plaintiff's claim for declaratory relief despite anti-injunction language of § 1082(a)(2) of the HEA); *Pro Schools,*

*Inc. v. Riley,* 824 F.Supp. 1314, 1315–16 (E.D.Wis.1993) (allowing plaintiff to file an amended complaint seeking declaratory relief for alleged violations of the HEA after claims for injunctive relief were dismissed). Plaintiff's challenge to the Secretary's interpretation is brought under the APA,[19] and courts have held that the anti-injunction clause of § 1082(a)(2) does not preclude relief for APA claims. *See, e.g., Canterbury Career School, Inc. v. Riley,* 833 F.Supp. 1097, 1102–03 (D.N.J.1993); *Int'l Dealers School, Inc. v. Riley,* 840 F.Supp. 748, 749–50 (D.Nev.1993).

Accordingly, the Court finds that the HEA does not preclude award of declaratory relief, should the facts warrant.

## C. PLAINTIFF'S CLAIM THAT THE SECRETARY ACTED ARBITRARILY AND CAPRICIOUSLY IN INTERPRETING THE BUDGET ACT TO REQUIRE PAYMENT OF THE 30 BASIS POINT FEE ON SECURITIZED LOANS

Sallie Mae contends that the Department of Education acted arbitrarily and capriciously in advising Sallie Mae that the offset fee would apply to loans involved in its proposed securitization program.

### Standard for Judicial Review of Agency Action

■ In reviewing an agency's interpretation of the laws it administers, this Court must first look to the plain language of the statute. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Absent a clearly expressed legislative intent to the contrary, the plain language of the statute "must ordinarily be regarded as conclusive" *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Agency action must be set aside if it is "arbitrary, capricious, or an

18. *Ciba–Geigy Corp.,* 801 F.2d at 434.

19. The APA—the statute under which Plaintiff challenges the Secretary's application of the 30 basis point fee to securitized loans—waives sovereign immunity for actions "seeking relief other than money damages and stating a claim that an agency or an officer ... thereof acted or failed to act in an official capacity or under color of legal authority." 5 U.S.C. § 702.

abuse of discretion." *Motor Vehicle Mfrs. Ass'n of the U.S. v. EPA* 768 F.2d 385, 389 (D.C.Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 892 (1986). If a statute is silent or ambiguous on a point, substantial deference must be given to the interpretation of that statute by the agency that is responsible for its implementation. The interpretation given by the agency need not be the only interpretation possible as long as it is a reasonable one. *Chevron,* 467 U.S. at 842–45, 104 S.Ct. at 2781–83. A reviewing court should not defer to an agency position which is contrary to unambiguous Congressional intent. *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 475–76, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992).

### Discussion

The amendment to the HEA provides, in relevant part:

> The Association shall pay to the Secretary, on a monthly basis, an offset fee calculated on an annual basis in an amount equal to 0.30 percent of the principal amount of each loan made, insured or guaranteed under this part that the Association holds ... and that was acquired on or after August 10, 1993.

20 U.S.C. § 1087–2(h)(7)(A).

The statute does not contain a definition of the word "holds." Plaintiff argues that the Court must adopt the definition of "holder" that appears elsewhere in the statute. 20 U.S.C. § 1085(i) defines "holder" as "an eligible lender who owns a loan."

The government states that reliance on the term "holder" is misplaced. Specifically, DOE argues that, because the assessment in question applies only to Sallie Mae, the term "holds" must be interpreted on its own terms.

■ Generally, the same terms used in different sections of the statute have the same meaning. *See, e.g., Sullivan v. Stroop,* 496 U.S. 478, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990). Nothing in the record suggests a compelling reason for reading § 1085(i) and § 1087–2(h)(7)(A) differently.

■ "[I]f the intent of Congress is clear, that is the end of the matter; for the court,

as well as the agency must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–843, 104 S.Ct. at 2781. The Court will not extrapolate a definition when one has been provided in the text of the statute. The Court finds that for determining who "holds" a loan for purposes of the special assessment, one must look to the definition of "holder".

■ Adopting the statutory definition of "holds," it is apparent that after executing the proposed transaction, Sallie Mae will no longer "own" the loans. *See* 20 U.S.C. § 1085(i). All major indicia of ownership will be ceded by Sallie Mae upon the transfer. Sallie Mae's voting rights will be diluted to that of a one percent equity holder; and Sallie Mae will treat the transfer of the loans as a sale for purposes of Generally Accepted Accounting Principles and for purposes of income tax reporting. Finally, the loans will cease to appear on Sallie Mae's balance sheet for corporate reporting purposes.

The Secretary's determination seems to be premised on the basis that the loans sold to the trust are to be attributed to Sallie Mae and be deemed to be held by it. Clearly, if Sallie Mae sold outright a percentage of the loans held in its portfolio to third parties, it would be inconceivable that the Secretary would seek to impose a fee with respect to those loans. Even if Sallie Mae continued to service those loans, the result should be the same. In essence, what seems to be the principal basis for the Secretary's position is the 1 percent ownership interest that Sallie Mae has in the Trust. This small ownership interest does not establish a logical basis to subject the trust's entire loan portfolio to the congressionally mandated fee.

Innovation is one of the hallmarks of our dynamic free market system. Here Sallie Mae is trying a market experiment. There are sufficient non-fee avoidance reasons for Sallie Mae to be embarking on its privatization program. To stymie it by an expansive interpretation of a statute that does not specifically cover the proposed transaction would be another example of excessive and mischievous federal regulation.

This decision is premised on the good faith representations of Plaintiff's counsel that the securitization transactions at issue here represent innovative financing activity rather than mere fee avoidance. This Court has no desire to create a "Northwest Passage" around the offset fee. The Court's analysis is based upon the representations of Plaintiff's counsel that only a small portion of the total Sallie Mae portfolio of student loans will eventually be securitized. Certainly the Secretary has the authority to closely scrutinize and monitor the program. If he should find that the securitization program is an attempt at fee avoidance, he has the choice to seek remedial court action or relief from the legislature.

## CONCLUSION

For the reasons stated above, the Court finds that jurisdiction is proper in this case. The Court further finds that 20 U.S.C. § 1087–2(h)(7)(A) does not effect an uncompensated taking of private property nor violate Plaintiff's equal protection rights. In view of the clear statutory definition of "holder," the Court finds that it was arbitrary and capricious and an abuse of discretion to interpret § 1087(h)(7)(A) to require Sallie Mae to pay the 30 basis point fee on loans sold to an independent trust under the securitization transaction program.

An appropriate order accompanies this memorandum opinion.

## ORDER

This matter comes before the Court on cross-motions for summary judgment. The Court finds that jurisdiction is proper in this case. The Court further finds that 20 U.S.C. § 1087–2(h)(7)(A) does not effect an uncompensated taking of private property nor deny equal protection under the Fifth Amendment. Finally, in view of the clear statutory definition of "holder," the Court finds that it was arbitrary and capricious to interpret § 1087–2(h)(7)(A) to require Sallie Mae to pay the 30 basis point fee on loans transferred to an independent trust under the securitization transaction described above.

Accordingly, the Court hereby **ORDERS** that Plaintiff's motion for summary judgment

is **GRANTED** in part, and **DENIED** in part. The Court further **ORDERS** that the Defendant's motion for summary judgment is **GRANTED** in part, and **DENIED** in part.