**STUDENT LOAN MARKETING ASSOCIATION, Plaintiff,**

v.

**Richard RILEY, Secretary of the U.S. Department of Education, Defendant.**

**No. Civ. 98–3040(ESH).**

United States District Court, District of Columbia.

Aug. 23, 2000.

---

Robert S. Lavet, Sheldon D. Repp, Sallie Mae, Incorporated, Reston, VA, for plaintiff.

Laura J. Weinstein, Assistant U.S. Attorney, Washington, DC, W. Neil Eggleston, Timothy K. Armstron, Howrey & Simon, Washington, DC, Mark L. Pelesh, Jeffrey J. Lopez, Drinker, Biddle & Reath, LLP, Washington, DC, for defendants.

### MEMORANDUM OPINION

HUVELLE, District Judge.

Before the Court are plaintiff's motion for summary judgment and defendant's cross-motion for summary judgment. The issue before the Court is whether to uphold the Secretary's decision that plaintiff has violated the anti-inducement provision of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. § 1085(d)(5)(A), which prohibits a lender from offering "directly or indirectly, points, premiums, payments, or other inducements, to any educational institution or individual in order to secure applicants for loans." Upon consideration of the pleadings and the entire record herein, and for the reasons stated below, the Court concludes that the Secretary's decision cannot be sustained and plaintiff's motion will be granted.

## BACKGROUND

Plaintiff is a congressionally chartered, for-profit corporation financed by private sector capital. It was established by Congress in 1972 as a Government Sponsored Enterprise through the HEA to serve as a national secondary market for student loans. Plaintiff's activities include buying and financing student loans made under the Federal Family Education Loan Program ("FFEL Program"), formerly the Guaranteed Student Loan Program.

Under the FFEL Program, private lenders make loans to students attending eligible postsecondary schools. A postsecondary school may act as a lender under the FFEL Program, subject to certain conditions. 20 U.S.C. § 1085(d)(2); 34 C.F.R. § 682.207(b)(1). The repayment of the loans is guaranteed by state or private non-profit guaranty agencies that are reinsured by the Department of Education ("DOE"). See 20 U.S.C. § 1078(c). As a lender, a postsecondary school, like all other holders of subsidized guaranteed student loans, is authorized to receive interest and special allowance payments from the DOE during the period when payments from the borrower are deferred to cover administrative costs. 34 C.F.R. § 682.302(a).

Plaintiff provides various loan programs and services for FFEL Program borrowers whose loans it owns, including incentive programs that reduce the borrower's interest rates. Students can have access to these benefits if they borrow through institutions that have an operational support agreement with plaintiff. Plaintiff also offers secured loans and lines of credit, called "warehousing advances," to lenders to fund FFEL Program loans. These advances are collateralized at levels equal to at least 100 percent with insured education loans or other acceptable collateral. Most of plaintiff's loan purchases are ac-

complished using multi-year forward purchase commitments.

### The Agreements

Dr. William M. Scholl College of Podiatric Medicine ("Scholl College") became an eligible lender under the FFEL Program in 1989. At that time, Scholl College entered into a number of contracts with plaintiff, including a Forward Financing Commitment Agreement, and two operational support agreements—an ExportSS Loan Origination and Loan Servicing Agreement and an ExportSS Comprehensive Commitment and Loan Sale Agreement. Plaintiff and Scholl College executed the ExportSS agreement at issue in April 1995.[1] Under the April 1995 ExportSS agreement, plaintiff processed student loan applications and performed loan origination activities on behalf of Scholl College, which was payee and legal owner of all of the loans. Plaintiff charged Scholl College origination and servicing fees at commercially acceptable rates. The agreement provided that Scholl College is to sell all loans originated under the agreement to plaintiff, generally before the 120th day prior to the time the borrower enters repayment.

For each loan portfolio it purchases, plaintiff pays Scholl College 100% of the principal balance and accrued interest plus an amount of up to 2.50% over par value (referred to by the parties as an "incentive fee"), depending upon the average borrower indebtedness ("ABI") of the loans in the portfolio and the number of serial loans in the portfolio.

Plaintiff and Scholl College were also parties to a Revolving Financing Agreement dated July 14, 1995. This agreement provided that plaintiff could make advances of up to twenty million dollars to Scholl College to finance Scholl College's lending activities through March 1998. Scholl College paid interest quarterly on any advances at the 13 week Treasury bill rate plus 1.25%. Plaintiff charged a higher interest rate to Scholl College than it charged to most other school lenders that are ExportSS clients.

### Dear Colleague Letters

In February 1989 the DOE issued "Dear Colleague Letter" 89–L–129 ("1989 DCL"), to provide lenders and guarantee agencies with guidance in complying with the anti-inducement provisions of the HEA. (Administrative Record 1001–1004 ("R.")). The letter explained that:

> Some financial incentives provided by lenders and guarantee agencies are expressly permitted by statute, and are therefore not subject to the statutory prohibitions quoted above. Other activities provide some financial benefit to prohibited recipients of inducements, but are nevertheless permissible because the financial value of the benefit is nominal, or the activity is not undertaken to directly secure applications from individual prospective borrowers, but rather as a form of generalized marketing or advertising. In addition, we do not believe these provisions were intended to prevent lenders and guarantee agencies from attempting to do a better job than their competitors in carrying out their established roles in the Part B programs, even if the improved service confers a financial benefit on schools or others.

(R. 1002–03). The DOE also provided examples of activities that are permissible under the anti-inducement provisions, including the following:

> A lender purchases a loan made by another lender at a premium. This is not a transaction involving the securing of applicants, but rather the acquisition of loans already made. A purchasing lender may also act as the agent of a selling lender on a loan to be purchased for purposes of originating and disbursing

---

1. The April 1995 ExportSS agreement was superseded by a new ExportSS agreement dated May 1, 1997. That agreement is substantially the same as the April 1995 Export SS agreement.

the loan, and purchase the loan at a premium immediately following disbursement. The funds used to make the loan would be deemed to have been advanced to the seller by the purchaser and subsequently repaid from the sale proceeds.

(R. 1003).

In March 1995 the DOE issued DCL 95–L–178 ("1995 DCL"), another guidance letter, advising Program participants that "the Secretary will look at the substance of any arrangements rather than merely their form" in determining whether there has been a violation of the anti-inducement provision. (R. 1007). The letter proceeded to state that:

We have recently learned of a number of relationships between non-school lenders and schools in which the non-school lenders have arranged for the schools to be the lenders of record and receive the interest subsidy for part or all of the in-school period on loans later "bought" by the non-school lender. Thus, the school receives all the income on the loan during its most desirable phase, when both the expense and risk of default are the least. Often the non-school lender also provides the financing for the school to fund its "holding" of the loan at an advantageous rate.

*Id.*

### Procedural History

On July 14, 1995, the U.S. Department of Education's Office of Student Financial Assistance Programs ("SFAP") initiated an administrative proceeding to limit plaintiff's eligibility to participate in the FFEL Program, alleging that contractual arrangements between plaintiff and Scholl College "provide an improper inducement to the school to steer students to Sallie Mae" and therefore violate § 435(d)(5)(A) of the HEA. An evidentiary hearing was held on August 6, 1996 before Administrative Law Judge ("ALJ") Richard O'Hair of the Department of Education's Office on Hearings and Appeals. On September 26, 1996, the ALJ issued a written decision rejecting SFAP's request to limit plaintiff's eligibility to participate in the FFEL Program.

SFAP appealed the ALJ's decision to the Secretary. On February 4, 1997, the Secretary remanded this matter, directing the ALJ to "address the legal issue of whether the Department may, under the provisions of the Higher Education Act and other applicable principles of law, characterize a party as a lender under the FFEL program based on the substance of the transactions involved and in spite of their form." *In the Matter of Student Loan Marketing Assoc.*, Dkt. No. 96–23–SL, Remand Order at 1.

On July 18, 1997, the ALJ determined that the form of the transactions between plaintiff and Scholl College should not be ignored and that plaintiff "should not and cannot be characterized as the originating lender of loans to students enrolled at Scholl College." *In the Matter of Student Loan Marketing Assoc.*, Dkt. No. 96–23–SL, Decision Upon Remand at 5.

SFAP again appealed the ALJ's order to the Secretary. On October 13, 1998, the Secretary, reversing the ALJ's order, found that in light of the a "clear intent to separate the role of the lender and the school" and "the need to ensure that borrowers receive full and complete information from their school, it is appropriate for the Department [of Education] to ignore the form of Scholl College's role under the contracts . . ." *In the Matter of Student Loan Marketing Assoc.*, Dkt. No. 96–23–SL, Decision of the Secretary at 2. The Secretary further found that the "responsibilities performed by Sallie Mae give rise to the finding that it is the actual lender under these agreements" and the "payments made by Sallie Mae (the actual lender), to Scholl College (an educational institution) constitute improper inducements made to secure loan applicants in violation of the HEA, § 435(d)(5)(A)." *Id.* at 3. Consequently, the Secretary ordered that plaintiff be limited from participating

in the Scholl College FFEL Program. Plaintiff has ceased purchasing loans disbursed by Scholl College since the Secretary issued his order.

Plaintiff now seeks to set aside the Secretary's order limiting its participation in the Scholl College FFEL Program, arguing that defendant's decision is arbitrary, capricious, an abuse of discretion and otherwise contrary to law, in violation of the Administrative Procedure Act, 5 U.S.C. § 706.

## LEGAL ANALYSIS

### Standard of Review

Under the Administrative Procedure Act ("APA"), an agency's action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In making this finding, the Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The Court may not substitute its judgment for that of the agency. *Id.* If the "agency's reasons and policy choices . . . conform to 'certain minimal standards of rationality' . . . the rule is reasonable and must be upheld." *Small Refiner Lead Phase–Down Task Force v. U.S. EPA,* 705 F.2d 506, 521 (D.C.Cir.1983) (citation omitted).

An agency's interpretation of a statute should be upheld as long as it is a permissible interpretation. *Chevron USA Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "In ascertaining whether the agency's interpretation is a permissible construction of the language, a court must look to the structure and language of the statute as a whole." *K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291, 108 S.Ct. 1811, 100 L.Ed.2d 313 (1988). To be permissible, the agency's determination must be "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union, Local 23,* 484 U.S. 112, 123, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987).

### I. Secretary's Position

In a cryptic three-page decision, defendant found that it was proper to ignore the form of the transactions between plaintiff and Scholl College and recharacterize plaintiff as the originating lender. He based his decision on an alleged "clear intent to separate the role of the lender and the school." *In re Student Loan Marketing Assoc.,* Dkt. No. 96–23–SL, Secretary's Decision at 2. Relying on his determination that the recharacterization of plaintiff as lender was justified, defendant further concluded that "[a]ccordingly, the payments made by Sallie Mae (the actual lender), to Scholl College (an educational institution) constitute improper inducements made to secure loan applicants in violation of the HEA, § 435(d)(5)(A)." *Id.* at 3.

The decision fails to explain what specific aspects of the transactions defendant finds to constitute improper inducements. However, defendant's briefs identify two alleged inducements: the incentive fee paid by plaintiff to Scholl College for each loan portfolio it acquires and the "spread" between the interest and the special allowance payable by DOE on the one hand and the lesser interest due on plaintiff's "advances" to Scholl College on the other during the lag time between the date that the loan is disbursed and the date that plaintiff officially acquires the loan from Scholl College.[2] (Def. Cross–Mot. at 16–17). It appears that defendant does not

---

2. Scholl College is obliged to sell certain qualified loans to plaintiff at least 120 days before the borrower enters repayment status. During this period, Scholl College, like all other holders of subsidized loans, receives a special allowance from the DOE that is paid to lenders for each subsidized loan for which the borrower has not yet entered repayment status.

contend that these "inducements" in and of themselves are improper; rather defendant argues that the arrangement between plaintiff and Scholl College as a whole constitutes an improper inducement. (*See* Def.Opp. to Pl.Mot. at 8 ("The issue is not whether the various components of the contracts, *viewed in isolation,* are 'traditional,' are in part 'customarily performed by third party servicer[s],' or involve a return that is worthwhile from the point of view of a reasonable servicer or lender. Instead, the Department's position is that the contracts must be viewed in their entirety, and that the violation is evident when this is done.") (emphasis in original); Def. Reply at 3 ("As Sallie [Mae] has acknowledged, the Secretary's decision applying the anti-inducement provision rests on the substance, extent and effect of Sallie Mae's contractual rights and obligations as a whole regarding the applicants Scholl refers. It is the combination, rather than the individual components, that violates Section 435(d)(5)(A)")). Defendant's pleadings thus make clear that the Secretary's position is predicated on recharacterizing plaintiff as the originating lender in order to find that a violation exists. Since the Secretary has failed to identify either a legal or factual basis for such recharacterization, his decision must be reversed as arbitrary, capricious, and not in accordance with law.[3]

## II. Secretary's Decision is Arbitrary, Capricious, and Not in Accordance with Law

### A. No Legislative Intent

The Secretary's Decision to recharacterize plaintiff as the originating lender is arbitrary and capricious because it is based on an assumed legislative intent which simply does not exist. Defendant asserts that "[i]n the FFEL program there is a clear intent to separate the role of the lender and the school." 34 C.F.R. § 682.601(a). According to defendant, "these distinct roles and the need to ensure that borrowers receive full and complete information from their school make it is appropriate for the Department to ignore the form of Scholl College's role under the contracts and evaluate the actual responsibilities of each party." *In the Matter of Student Loan Marketing Assoc.,* Dkt. No. 96–23–SL, Secretary's Decision at 2. Defendant also asserts that the anti-inducement provision seeks to preclude schools from marketing educational loans and distributing loan application packages, and therefore, when a school is performing these functions, a "third-party servicer" "goes far beyond mere servicing" and "is actually the lender." (Def.Opp. to Pl.Mot. at 6–7).

Defendant has cited no statutory, regulatory, or legislative support for the conclusion that schools should not act as lenders. In fact, the regulation to which the Secretary refers expressly permits schools to act as lenders, as its caption heading reads: "Rules for a school that makes or originates loans." 34 C.F.R. § 682.601(a). There also is no legislative history to support the claim that Congress intended to limit graduate and professional schools in their role as lender in the way defendant suggests. While Congress has amended the HEA several times since it was enacted, Congress has never passed any amendment preventing graduate and professional schools from acting as lenders. *See* Higher Education Amendments of 1986, Pub.L. No. 99–498, 100 Stat. 1268, 1411–12; Higher Education Technical Amendments of 1987, Pub.L. No. 100–50, 101 Stat. 335, 347; Higher Education Amendments of 1992, Pub.L. No. 102–325, 106 Stat. 448,

---

**3.** Defendant appears to be of the view that it must recharacterize plaintiff as the originating lender so as to apply the anti-inducement provision to plaintiff's conduct. In the absence of this recharacterization, the Secretary is stymied by the ALJ's initial determination that "the prohibited conduct does not apply to Sallie Mae because it does not secure loan applicants, but only secures the final product, consummated loans." *In the Matter of Student Loan Marketing Assoc.,* Dkt. No. 96–23–SL, Initial Decision at 8.

549–50; Higher Education Amendments of 1998, Pub.L. No. 105–244, 112 Stat. 1581. Rather, the limitations that have been imposed through regulation suggest that careful consideration has gone into what restrictions should be applied, and that Congress has chosen not to prevent schools such as Scholl College from acting as lenders.[4]

Moreover, nothing in the statute or regulations prohibits a school lender from establishing a relationship with a third-party servicer that takes the form of the arrangement that exists between plaintiff and Scholl College, even if the arrangement effectively renders the school lender a mere marketer of loans. Plaintiff's authority to "service . . . at prices and on terms and conditions determined by [plaintiff], student loans which are insured by the Secretary . . . or by a guaranty agency" is confirmed in the DOE's regulations, which specify: "A school, lender, or guaranty agency may contract or otherwise delegate the performance of its functions under the Act and this part to a servicing agency or other party." 34 C.F.R. 682.203(a). The regulation does not limit in any way how lending functions may be delegated; nor does it exclude any lending functions from delegation. Thus, under the Act, a lender does not shed its status as the lender in a transaction even if its functions are delegated to a third party. Rather, each of the functions delegated by Scholl College, as lender, to plaintiff, as third-party servicer, in their contractual relations is independently authorized by statute. While the regulation addresses

the conflict of interest that may arise from a school acting in both lending and advisory capacities by discussing specific requirements when lending to undergraduate students,[5] the regulation cannot be reasonably interpreted as expressing a "clear intent to separate the role of the lender and the school," as claimed by defendant. (Def.Opp. to Pl.Mot. at 10).

Defendant also emphasizes that Scholl College's alleged failure to bear the risks of a FFEL lender, in combination with its failure to perform certain lending functions on its own, renders its status as a lender untenable. (Def. Reply in Supp. of Cross–Mot. at 6–10). The Court agrees with the ALJ's conclusion that "the fact that Scholl College holds the loans during a period in which it has very few servicing obligations and, as SFAP alleges, it 'assumes no significant financial risk,' does not require a conclusion that Sallie Mae, and not Scholl College, is the lender of loans held by the latter." *In re Student Loan Marketing Assoc.*, Dkt. No. 96–23–SL, Decision Upon Remand at 3. One example highlights the problem associated with attempting to assign the role of "originating lender" based on these concepts: a lender might contract with one party to handle all of its originating and servicing functions, contract with another party to obtain capital to fund its loans, and contract with still another party to sell its loans once they have been disbursed.[6] The institutional lender in such a case bears the same risk as Scholl College in its arrangements with plaintiff. However, it would be difficult, if not impossible,

---

4. The limitations that have been imposed have focused on undergraduate—rather than graduate and professional school—lending. For example, a school must "inform any undergraduate student who has not previously obtained a loan that was made or originated by the school and who seeks to obtain such a loan that he or she must first make a good faith effort to obtain a loan from a commercial lender." 34 C.F.R. § 682.601(a)(4). Such undergraduate students must show proof of denial of a loan from a commercial lender before a school may make loans to them. 34 C.F.R. § 682.601(a)(5), (b). Such

restrictions are not imposed on school lenders such as Scholl College, which make loans solely to professional students.

5. *See* note 4, *supra.*

6. In fact, a witness for defendant, M. Feuerstein, suggested that an arrangement in which the capital is provided to the institution by a party different from the party that ultimately purchases the loans might be less likely to give rise to a situation in which an illegal inducement exists. (R. 539).

to identify the "originating lender" under defendant's proposed test. The Court does not believe that Congress intended to inject this kind of uncertainty into the statute's application. In light of the specific authority that lenders have to both delegate their functions to third-party servicers and to engage in forward purchasing agreements, any decision to ignore the form of the transaction on the basis of risk and functions performed would be inconsistent with the governing law and regulations.

Defendant's interpretation of the statute is also unreasonable because the circumstances surrounding the Scholl College/Sallie Mae arrangement do not appear to be the focus of the anti-inducement statute, as explicated by SFAP. Defendant states that "[t]he committee reports regarding the bill reflect Congress's intent to bar inducements generally to foreclose the possibility of exploitation of student and parent borrowers." (Def. Cross–Mot. at 7). Larry Oxendine, the Acting Director of the Guarantor and Lender Oversight Staff for the FFEL Program at SFAP, testified that a purpose of the provision was to prohibit educational institutions from encouraging students to take out loans "whether or not they actually need them" and to take out "the maximum amount of loan." (R. 453). He further testified that purpose was to address "some abuses that were taking place in the FFEL Program that received a great deal of attention," including 1) a case in which bank tellers were being paid $50.00 to bring their friends into the bank to take out loans; 2) a case in which a bank was giving away free walkman radios to students who took out loans; and 3) a case in which a bank took a group of financial aid administrators on a cruise to encourage them to do business with that bank. (R. 437). Here, there is no evidence that plaintiff exploited any borrowers or encouraged Scholl College to exploit its student borrowers. *In re Student Loan Marketing Assoc.*, Dkt. No. 96–23–SL, Initial Decision at 5 ("when questioned, neither of SFAP's witnesses were aware of any in-

stances of . . . improprieties [similar to the examples SFAP presented] committed by either Sallie Mae or Scholl College"). Scholl College expressly informs its students that they are free to borrow from any lender. (R. 822–23 (Decl. of Packard ¶ 8); *see* R. 822–55 (Scholl College Financial Aid Program brochure)). Scholl College also counsels its students to limit their borrowing as much as possible and suggests alternatives to loans. (R. 828). Additionally, it is significant that Scholl College maintained a low student borrower default rate (0.8% in 1996 and 1.6% in 1994), which strongly suggests that Scholl College does not encourage students to engage in unnecessary or excessive borrowing. (R. 863–64 (DOE notifications of cohort default rate)). Thus, the Court agrees with the decision of the ALJ that "[t]his business arrangement is not the type of conduct which Congress intended to prohibit." *In re Student Loan Marketing Assoc.*, Dkt. No. 96–23–SL, Initial Decision at 7.

## B. The Case Law Does Not Support Recharacterization of Plaintiff as Lender

Without any regulatory or statutory support, defendant's analogies to cases in which the form of the transaction is ignored are inapposite. *See Student Loan Marketing Association v. Riley*, 907 F.Supp. 464 (D.D.C.1995); *Capital Telephone Co. v. FCC*, 498 F.2d 734 (D.C.Cir. 1974); *H.P. Lambert Co. v. Sec. of Treasury*, 354 F.2d 819 (1st Cir.1965). Defendant relies on *Lambert* and *Capital* for the proposition that even where entities are incorporated as separate entities under authorized or customary forms, courts may disregard the form of the transaction and look to its substance. (Def. Reply in Supp. of Cross–Mot. at 18). In deciding whether to disregard the form of a transaction, the general rule is that "a corporate entity may be disregarded in the interests of public convenience, fairness and equity." *Capital*, 498 F.2d at 738. "In applying this rule, federal courts will look closely at that purpose of the federal statute to de-

termine whether the statute places importance on the corporate form." *Town of Brookline v. Gorsuch*, 667 F.2d 215, 221 (1st Cir.1981). Since Congress has permitted a lender to contract out its lending duties to third parties while retaining its status as a lender, it can be inferred that the statute placed an emphasis on form, and that the form is not to be ignored even where the underlying substantive duties are assigned to another party. Given the fact that the statute and the regulations specify that a school may act as a lender and may delegate its lending functions to a third-party servicer, the purpose of the statute would be frustrated by a determination that Scholl College's arrangements with plaintiff violate the HEA.

Furthermore, there is no factual basis for finding that the concerns that give rise to treating the form of the transactions as fiction in other contexts exist here. There has been no allegation that plaintiff was "attempting somehow to avoid an obligation or gain an improper advantage by interjecting a third party into the relationship, or incorporating, or by placing unrealistic labels on certain transactions." *In re Student Loan Marketing Assoc.*, Dkt. No. 96–23–SL, Decision Upon Remand at 4. Moreover, there has been no demonstration that plaintiff exercises any involvement in or control over the management of Scholl College. *See id.* SFAP reviewed Scholl College's activities as a school lender, with full knowledge of its contractual relations with plaintiff, and concluded that Scholl College's lending program was in full compliance with federal laws and regulations. (R. 866, 868). Thus, the factual record before the agency is devoid of any evidence of abuse that could arguably support the Secretary's Decision.

**C. Defendant Has No Basis for Attacking the Arrangement as Impermissible as a Whole While Agreeing that the Three Component Agreements are Permissible**

Congress has recognized that the individual agreements between plaintiff and Scholl College are permissible. 20 U.S.C. § 1087–2 establishes and defines the authority of plaintiff under the HEA. Specifically, plaintiff is authorized:

> (A) pursuant to commitments or otherwise to make advances on the security of, purchase, or repurchase, service, sell or resell, offer participations, or pooled interests or otherwise deal in, at prices and on terms and conditions determined by [plaintiff], student loans which are insured by the Secretary under this part or by a guaranty agency.

20 U.S.C. § 1087–2(d)(1)(A). Because plaintiff is authorized to "purchase loans" on "terms and conditions" that it can determine on its own, Congress clearly intended to grant plaintiff broad discretion in structuring its loan purchase agreements. Also, the DOE's regulations provide that third parties may, for example, process loan applications, determine student eligibility, disburse HEA program funds, and perform loan servicing and collection activities on behalf of a lender. 34 C.F.R. § 668.2(b).

Moreover, each agreement contains terms which are characteristic of traditional market transactions between lenders. Here, the "incentive fee" is essentially an amount above par paid for each portfolio of disbursed loans, as "[t]he portion of the purchase price in excess of par simply reflects the fact that in the competitive secondary market, portfolios of student loans with certain attractive characteristics have a market value in excess of their outstanding principal balances." (R. 618 (Decl. of Trevisan ¶ 10); R. 733 (sales premium comparison chart submitted by plaintiff at the administrative hearing, showing the purchase prices for loan portfolios for various lenders)). Defendant has not contested the ALJ's finding that the forward purchasing contract was "negotiated using competitive, market pricing." *In re Student Loan Marketing Assoc.*, Dkt. No. 96–23–SL, Initial Decision at 7.

Bank lenders routinely sell loans in the secondary market at prices over par, (R. 466 (testimony of Oxendine)), and evidence was presented at the administrative hearing that other institutional lenders also sell loans that they originate to banks at prices over par. (R. 465–66, 716, 726). Likewise, defendant's complaint about the fact that Scholl College earns a return while it owns the loans that have been disbursed does not convince the Court that the arrangements between plaintiff and Scholl College rise to the level of an improper inducement. Again, defendant does not contend that the contract was completed on unreasonable or non-market terms. (R. 468 (testimony of Oxendine, stating that defendant does not contend that plaintiff is offering Scholl College a below market or subsidized interest rate in its forward financing agreement)). As a result, what Scholl College gains from these transactions is no more than it would if the loan purchaser and loan financer were different parties. While the differential between the competitive, market interest rate charged by plaintiff to Scholl College and the higher amount paid by the DOE to the lender may result in an economic benefit to an institutional lender, because it was clearly demonstrated in the proceedings before the ALJ that that gain results from

market transactions typical of the secondary loan market, any "incentive" that Scholl College had to enter into contractual relations with plaintiff is unremarkable and therefore does not rise to the level of an "improper inducement." [7]

Defendant has conceded that each of the agreements is permitted under the statute. (Def. Reply in Supp. of Cross-Mot. at 3 ("It is the combination [of Sallie Mae's contractual rights and obligations regarding Scholl College and its loan applicants], rather than the individual components, that violates Section 435(d)(5)(A)."); R. 468 (testimony of Oxendine, agreeing that neither the provision of funding to a school for student loans nor the purchase of student loans is by itself an inducement within the meaning of 435(d)(5)); R. 469 (testimony of Oxendine, agreeing that institutional lenders are permitted to contract with another party for loan origination support and loan servicing under the statute); R. 509–10 (testimony of Feuerstein, indicating that no specific aspect of the arrangements between plaintiff and Scholl College raises a question of impropriety; rather, it is the "combination of arrangements" that is questioned); R. 510 (testimony of Feuerstein, stating that "Sallie Mae is authorized to make ad-

7. While a lender is prohibited from offering "inducements" to educational institutions, the statute does not define such inducements. A review of the legislative history does little to clarify Congress' intent. The House of Representative's Conference Report on the Higher Education Amendments indicates that when the House proposed having eligible lenders disqualified only after notice and opportunity for a hearing, this disqualification would result from "the use of *certain* incentives." H.R. Conf. Rep. No. 99–861 at 403 (1986), 1986 U.S.C.C.A.N. 2718 (emphasis added). The Report of the House of Representatives Committee on Education and Labor is equally vague. Similarly, the Senate Report of the Committee on Labor and Human Resources merely states that "[t]he Committee bill clarifies that no lenders can offer inducements to institutions or individuals to take out loans or to provide services unrelated to loans ..." S.R. Rep. No. 99–296 at 30 (1986). Significantly, Oxendine stated in a letter to plaintiff

regarding its contractual arrangements with Georgetown University:

> Obviously, any service or benefit conferred upon an educational institution by an eligible lender is likely an incentive for the institution to do business with the lender. The statutory language, however, expressly recognizes that disqualification of an eligible lender results only from the use of "certain incentives." The Department's guidance to lenders has also noted that not all arrangements between lenders and education institutions are prohibited inducements ...

(R. 1042). The letter continues to acknowledge "[t]he absence of any further specific Congressional guidance on the determination of which "incentives" constitute disqualifying "inducements." " *Id.* (*See also* R. 505 (testimony of L. Oxendine that "[t]here is no specific definition of inducement")). Thus, it appears that Congress intended that not all incentives would be treated as inducements.

vances")). In fact, defendant implied in the DOE's first official guidance given to lenders, the 1989 DCL, that agreements such as those existing between plaintiff and Sallie Mae are unobjectionable in combination, as an analogous transaction was given as an example of a permissible activity. (*See* R. 1003). Thus, defendant has provided no rational basis for invalidating the total arrangement between plaintiff and Scholl College where the individual agreements are traditional, customary of second-market transactions, and have been deemed acceptable by the DOE in the past.

### D. It is Irrational to Define the Actual Lender Based on Whether the Formally Named Lender is a School

Defendant's view of which party is the "originating lender" appears to turn on whether the entity selling the loans is a school lender or a non-school lender. Defendant argues that "the Department has never viewed Scholl as the lender under the anti-inducement provision" and that "the inducements arise as a result of Sallie Mae's contractual arrangements with Scholl, and not as a result of the payment of the purchase price." (Def.Opp. to Pl. Mot. at 11, 12). However, defendant has not disputed plaintiff's assertion that the DOE "does not consider Sallie Mae to be the originating lender when it purchases loans from banks, even when it provides financing to the banks and performs loan servicing and loan origination support for the banks under substantially the same terms as its arrangements with Scholl College." (Pl.Mot. at 32). Also, defendant has conceded that the same set of transactions would be permissible if it involved contracts between two non-school lenders. *In re Student Loan Marketing Assoc.,* Dkt. No. 96–23–SL, Decision Upon Remand at 5 ("an SFAP witness admitted that if Scholl College were a bank and not a school lender, SFAP would have no complaint about its operations"); (R. 420–21 (Siegel opening statement, stating that "[if] we were dealing with a lender which

was not a school—another bank, a savings & loans—we wouldn't be here. The department has never said that a lender cannot pay another lender a premium for a loan, but those transactions don't duplicate Section 435(d)(5)(A) which deals with payments by a lender to a school")). However, in the absence of some statutory prohibition against a professional school acting as a lender, it is not rational for the Secretary to recharacterize the role of the parties merely because the contract partner is a school.

### CONCLUSION

The Court understands that defendant may, as a matter of policy, want to prevent graduate and professional schools from receiving any financial incentives for providing loans to their students, but neither the statute nor its legislative history precludes this type of activity, and a prohibition cannot be manufactured by a recasting of the roles of the parties in an attempt to argue, as defendant does here (Def. Cross–Mot. at 17), that the contractual arrangements, when taken as a whole, violate the spirit of the anti-inducement provision of the statute. Therefore, the Court will deny defendant's cross-motion and will grant plaintiff's motion for summary judgment.